# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### *SAN JOSE DIVISION*

### THE UNITED STATES OF AMERICA

### vs

### DORY LINDSAY FORD

**CR 24 00050 EJD**

*FILED JAN 25 2024 CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA*

## INDICTMENT

| | |
|---|---|
| COUNT 1: | 18 U.S.C. § 1344 – Bank Fraud |
| COUNTS 2-4: | 18 U.S.C. § 1343 – Wire Fraud |
| COUNT 5: | 18 U.S.C. § 1957 – Money Laundering |
| COUNT 6: | 18 U.S.C. § 1957 – Money Laundering |

*A true bill.*

_____
*Foreperson*

*Filed in open court this* __25th__ *day of* __January__ *A.D. 202*__4__

_____
*United States Magistrate Judge* (Virginia K. DeMarchi)

*Bail. $* __Summons for January 31, 2024 at 1:00 p.m.__

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
FILED
JAN 25 2024
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DORY LINDSAY FORD,<br><br>Defendant. | CASE NO. CR 24 00050 EJD<br><br>VIOLATIONS:<br>18 U.S.C. § 1343 – Wire Fraud;<br>18 U.S.C. § 1344 – Bank Fraud;<br>18 U.S.C. § 1957 – Money Laundering;<br>18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), 18 U.S.C. §§ 982(a)(1), (2) – Forfeiture Allegation<br><br>SAN JOSE VENUE |

INDICTMENT

The Grand Jury charges:

Introductory Allegations

At all times relevant to this Indictment:

1. Defendant Dory Lindsay Ford ("FORD") resided in the Northern District of California. He operated a catering company called Aqua Terra Culinary, Inc. (Aqua Terra) in Monterey County, California.

2. Aqua Terra was a private company organized under the laws of the State of California with a principal place of business in Pacific Grove, California. Aqua Terra provided catering services for various events and entities.

INDICTMENT

3. During the relevant time period, FORD controlled and was the sole signatory for a Bank of America account ending in 3435 (BOA 3435). BOA 3435 was held in the name of Aqua Terra and opened in or about February 2021.

4. During the relevant time period, FORD and his wife were signatories for an InBank account ending in 3842 (InBank 3842). InBank 3842 was held in the name Aqua Terra and was opened in or about June 2021.

5. During the relevant time period, FORD, his wife, and a third individual were signatories for a Bank of America account ending in 0583 (BOA 0583). BOA 0583 was held in the name of Aqua Terra and opened in or about December 2017.

6. During the relevant time period, Bank of America's servers were located in Texas and Pennsylvania.

7. During the relevant time period, InBank's servers were located in New Mexico, Colorado, Oklahoma, and Kansas.

The Restaurant Revitalization Fund ("RRF")

8. The United States Small Business Administration ("SBA") is a federal government agency that was responsible for administering the Restaurant Revitalization Fund ("RRF").

9. During the relevant time period, RRF applications were received and processed by SBA servers in Oregon and all electronic payments made by the SBA under the RRF were processed, via wire, through computer servers located in Virginia.

10. Section 5003 of American Rescue Plan Act of 2021 (ARPA) established the RRF and appropriated $28.6 billion to the SBA for the purpose of making grants under the RRF. The SBA awarded funding through the RRF to restaurants, bars, and similar businesses serving food and drink. The purpose of this funding was to provide support to eligible entities that suffered revenue losses as a result of the COVID-19 pandemic and related mitigation measures.

11. According to ARPA, the SBA was authorized to provide funding up to $5,000,000 per location (not to exceed $10,000,000 total for the applicant and any affiliated businesses) for applicants who met certain conditions. Awardees were not required to repay funds received under the RRF unless

INDICTMENT 2

the funds were used for unauthorized purposes; were not used by March 11, 2023; or the recipient permanently closed before using all funds on authorized purposes.

12. Pursuant to Section 5003(c)(5) of the ARPA and the SBA RRF program guidelines, recipients of RRF funds were authorized to use the funds for only certain specified purposes, including, among other things, business payroll costs; business maintenance expenses, including construction to accommodate outdoor seating and walls, floors, deck surfaces, furniture, fixtures, and equipment; and food and beverage expenses that are within the scope of the normal business practice of the recipient. A list of eligible uses was also included on the RRF application. Use of RRF funds to purchase securities was not an eligible expense under the ARPA or SBA program guidelines. Additionally, according to the SBA RRF program guidelines, if awardees had not used all RRF funds on authorized purposes by December 31, 2021, they were required to report to the SBA the amount of RRF funds that had been used on each category of authorized purposes up to that date.

### The Paycheck Protection Program

13. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

14. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In

addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

15. A PPP loan application was required to be processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

16. PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, mortgage payments, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain amount of the PPP loan proceeds on payroll expenses.

### The Economic Injury Disaster Loan Program

17. The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters. During the relevant times servers that received EIDL applications were in Virginia, Iowa, or Washington state. Disbursement of EIDL funds were initiated by SBA's Finance Center, located in Colorado.

18. The CARES Act also authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL loan. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

19. In order to obtain an EIDL loan and/or advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDL loans for COVID-19 relief, the 12-month

INDICTMENT                                4

period was that preceding January 31, 2020. The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

20. EIDL applications were submitted directly to the SBA. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL loan or advance were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a loan under the PPP, the EIDL funds amount needed to be declared by the applicant and deducted from the total loan eligibility.

### Relevant PPP Lenders and Affiliated Companies

21. During the relevant times, Lender 1 was a federally insured financial institution based in North Carolina. Lender 1 was an SBA-approved PPP lender to small businesses.

### The Scheme to Defraud

22. In furtherance of the scheme and artifice to defraud, FORD used a variety of means and methods, including the false and fraudulent, representations, promises, and omissions and concealment of material facts described below.

23. On or about April 3, 2020, FORD applied for a PPP and an EIDL loan. On or about May 5, 2020, FORD received a PPP loan in the amount of $308,917 from Bank of America, which was wire to BOA 0583. On or about June 9, 2020, the EIDL loan was wired to BOA 0583.

24. On or about January 21, 2021, Lender 1 received a second PPP application from FORD seeking another loan for Aqua Terra.

25. The PPP application asked the borrower the following question:

> Has the Applicant, an owner of a business, or any business owned or controlled by any of them, ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted in the last 7 years and caused a loss to the government?

FORD falsely stated "No" to this question.

INDICTMENT                                5

26. Relying on FORD's false statement, Lender 1 approved the PPP application. On or about March 11, 2021, $446,183 was wired to a Bank of America account ending in 3435, BOA 3435. BOA 3435 was controlled by FORD, and he was the sole signatory for the account. BOA 3435 was held in the name of Aqua Terra and opened in or about February 2021.

27. On or about May 3, 2021, SBA received a RRF grant application from FORD seeking a grant for Aqua Terra.

28. On the RRF application, FORD made false promises by checking boxes indicating that he would use RRF funds for (1) "Business Payroll Costs, including paid sick leave;" (2) "Business Rent / Business Mortgage;" (3) "Business Debt Service;" (4) "Business Utilities;" (5) Business Food and beverage expenses, including raw materials;" (6) "Business Maintenance Expenses;" and (7) "Business Supplies;" (8) "Covered Supplier Costs;" and (9) "Business Operating Expenses."

29. FORD also made the following self-certifications on the RRF application by placing his initials, "DF," next to each statement:

    a. "I understand that the Applicant business must use all funds only on eligible uses within the covered period, which is the period beginning on February 15, 2020 and ending on March 11, 2023. If the business permanently closes, the covered period will end when the business permanently closes or on March 11, 2023, whichever occurs sooner. Awardees that are unable to use all of the funds received on eligible expenses by the end of the covered period must return any unused funds to Treasury."

    b. "I understand that by signing this application and accepting RRF funds, I am agreeing that no later than the end of the covered period, I will certify to SBA that the Applicant business used all funds only on eligible uses within the covered period."

    c. "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a grant from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than

$5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or fine of more than $1,000,000."

30. FORD also falsely certified in the RRF form that "The Applicant business has not permanently closed."

31. In reliance on the false promises that FORD would use RRF funds only on eligible uses for Aqua Terra and other false certifications, on or about June 8, 2021, the SBA wired $3,313,398 to BOA 3435.

32. On or about June 15, 2021, and as part of the scheme to defraud, FORD wired approximately $2,850,000 from BOA 3435 to an InBank account ending in 3842 (InBank 3842). InBank3842 was held in the name Aqua Terra and FORD and his wife were the only signatories. InBank 3842 was opened in or about June 2021.

33. On or about July 30, 2021, FORD wired $246,245 from InBank3842 to a real estate company (Company 1). Company 1 is a based in Colorado and specializes in selling real estate in the Placentia region of the Central American nation of Belize. This $246,245 wiring was derived by funds received though the RRF. FORD used this money to purchase a parcel of property in Placentia, Belize.

34. On or about October 29, 2021, FORD wired $339,485 from InBank 3842 to Company 1. This $339,485 wiring was derived by funds received though the RRF. FORD used this money to purchase two parcels of property in Placentia, Belize.

35. Between on or about June 15, 2021, and on or about October 25, 2021, FORD wired a total of approximately $905,000 from BOA 3435 to a personal brokerage account (Brokerage 1). FORD is the sole signatory for Brokerage 1. FORD used Brokerage 1 to purchase various stocks and ETFs.

36. Between August 6, 2021, and April 28, 2022, FORD wired a total of approximately $380,000 from InBank 3842 to an InBank account ending in 6175 held in the name of Mycology Sciences, a mushroom nutritional supplement company owned by FORD. The $380,000 was derived by funds received though the RRF.

37. On or about May 7, 2021, FORD applied for a $350,000 EIDL modification for Aqua Terra. The purpose of the EIDL modification was to increase Aqua Terra's prior $150,000 EIDL to a total of $500,000. On the EIDL modification application, FORD falsely represented that Aqua Terra

INDICTMENT                                                                 7

was still an operational company with 75 employees that needed additional EIDL funding to support its operations and omitted material changes to his financial conditions.

38. Based on his false representations and omissions, SBA approved the EIDL modification.

39. On or about September 16, 2021, FORD applied for a second EIDL modification in the amount of $1,500,000 for Aqua Terra. The purpose of the EIDL modification was to increase Aqua Terra's prior $500,000 EIDL to a total of $2,000,000. On the second EIDL modification application, FORD falsely represented that Aqua Terra was still an operational company with 75 employees that needed additional EIDL funding to support its operations and omitted material changes to his financial conditions.

40. SBA rejected FORD's second EIDL modification.

41. On April 4, 2023, as part of the scheme to defraud, FORD submitted a RRF Post Award Report to the SBA. A RRF Post Award Report is a document that requires recipients of RRF grants to report on how RRF funds were used. FORD, signed under penalty of perjury, that he had spent all RRF funds appropriately. FORD failed to disclose that he used RRF funds to purchase of properties in Belize, fund a different business venture, and make investments in the stock market.

COUNT ONE:   (18 U.S.C. § 1344 – Bank Fraud)

42. Paragraphs 1 through 41 of this Indictment are re-alleged and incorporated as if fully set forth here.

43. On or about January 21, 2021, in the Northern District of California, and elsewhere, the defendant,

DORY LINDSAY FORD,

knowingly executed a scheme and artifice to defraud a financial institution and obtain moneys, funds, credits, assets, and other property owned by and under the custody and control of federally insured financial institutions by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

All in violation of Title 18, United States Code, Section 1344.

//

//

INDICTMENT                                              8

COUNTS TWO THROUGH FOUR: (18 U.S.C. § 1343 – Wire Fraud)

44. Paragraphs 1 through 41 of this Indictment are re-alleged and incorporated as if fully set forth here.

45. Beginning on or about April 3, 2020, and continuing through on or about April 4, 2023 in the Northern District of California and elsewhere, the defendant,

DORY LINDSAY FORD,

knowingly and with the intent to defraud participated in, devised, and intended to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts.

46. On or about the dates set forth below, in the Northern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud and attempting to do so, the defendant,

DORY LINDSAY FORD

did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds, specifically identified below:

| Count | Approx. Date | Description of Wire |
|---|---|---|
| 2 | June 8, 2021 | Interstate wire transfer of $3,313,398 from SBA to FORD's Bank of America account ending in 3435. |
| 3 | August 10, 2021 | Interstate wire transfer of $350,000 from SBA to FORD's Bank of America account ending in 3435. |
| 4 | September 16, 2021 | FORD's EIDL modification was received via interstate wire. |

All in violation of Title 18, United States Code, Section 1343.

COUNTS FIVE:   (18 U.S.C. § 1957 – Money Laundering)

47. Paragraphs 1 through 41 of this Indictment are re-alleged and incorporated as if fully set forth here.

INDICTMENT                                9

48. On or about June 15, 2021, in the Northern District of California, and elsewhere, the defendant,

**DORY LINDSAY FORD,**

did knowingly engage in a monetary transaction by, through, and to a financial institution, in affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the wiring of $246,245 to purchase one parcel of land in Placentia, Belize, such property having been derived from a specified unlawful activity, that is, Wire Fraud.

All in violation of Title 18, United States Code, Section 1957.

<u>COUNTS SIX</u>:     (18 U.S.C. § 1957 – Money Laundering)

49. Paragraphs 1 through 41 of this Indictment are re-alleged and incorporated as if fully set forth here.

50. On or about July 30, 2021, in the Northern District of California, and elsewhere, the defendant,

**DORY LINDSAY FORD,**

did knowingly engage in a monetary transaction by, through, and to a financial institution, in affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the wiring of $339,485 to purchase two parcels of land in Placentia, Belize, such property having been derived from a specified unlawful activity, that is, Wire Fraud.

All in violation of Title 18, United States Code, Section 1957.

FORFEITURE ALLEGATION:     (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), 18 U.S.C. §§ 982(a)(1), (2))

51. The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Sections 982(a)(1), (2).

//
//
//
//

INDICTMENT                              10

52.   Upon conviction for Count One of this Indictment, the defendant,

DOREY LINDSAY FORD,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2) all property, real or personal, constituting, or derived from proceeds the defendant obtained directly and indirectly, as the result of those violations.

53.   Upon conviction for Counts Two through Four of this Indictment, the defendant,

DOREY LINDSAY FORD,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(a)(2), all property, real or personal, constituting, or derived from proceeds the defendant obtained directly and indirectly, as the result of those violations.

54.   Upon conviction for Counts Five through Six of this Indictment, the defendant,

DOREY LINDSAY FORD,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) all property, real or personal, constituting, or derived from proceeds the defendant obtained directly and indirectly, as the result of those violations.

55.   If any of the property described above, as a result of any act or omission of the defendant:

    a.   cannot be located upon exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461©.

//

INDICTMENT                                                   11

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), Title 18, United States Code, Sections 982(a)(1), (2), and Federal Rule of Criminal Procedure 32.2.

DATED: 1/25/2024

A TRUE BILL

_____
FOREPERSON

ISMAIL J. RAMSEY
United States Attorney

_____
NEAL C. HONG
Assistant United States Attorney

INDICTMENT                                        12

AO 257 (Rev. 6/78)

| **DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT** |

BY: ☐ COMPLAINT   ☐ INFORMATION   ☒ INDICTMENT   ☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA

*FILED JAN 25 2024 CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA*

**OFFENSE CHARGED**

Count 1: 18 U.S.C. § 1344 – Bank Fraud
Counts 2-4: 18 U.S.C. § 1343 – Wire Fraud
Counts 5-6: 18 U.S.C. § 1957 – Money Laundering

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

**DEFENDANT - U.S**
▶ Dory Lindsay Ford

**DISTRICT COURT NUMBER**
CR 24 00050 EJD

**PENALTY:**
Count 1: 30 years of imprisonment, $1,000,000 fine, 5 years of supervised release, $100 special assessment per felony, forfeiture
Count 2-4: 20 years of imprisonment, $250,000 fine, 3 years of supervised release, $100 special assessment per felony, forfeiture
Counts 5-6: 10 years of imprisonment, $250,000 fine, 3 years of supervised release, $100 special assessment per felony, forfeiture

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)
Internal Revenue Service and Small Business Administration

☐ person is awaiting trial in another Federal or State Court, give name of court
_____

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District
_____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY   ☐ DEFENSE
SHOW DOCKET NO. _____

☐ this prosecution relates to a pending case involving this same defendant
MAGISTRATE CASE NO. _____

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
_____

Name and Office of Person Furnishing Information on this form   Ismail J. Ramsey
☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   Neal C. Hong

**DEFENDANT**

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction  } ☐ Federal ☐ State
6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution
_____

Has detainer been filed?   ☐ Yes   ☐ No
If "Yes" give date filed _____

DATE OF ARREST ▶ Month/Day/Year _____
Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶ Month/Day/Year _____

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

PROCESS:
☒ SUMMONS   ☐ NO PROCESS*   ☐ WARRANT   Bail Amount: _____

If Summons, complete following:
☒ Arraignment   ☒ Initial Appearance
Defendant Address:
_____

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: 1/31/24 at 1 p.m.   Before Judge: DeMarchi

Comments: